Simranjit Kaur (SBN 309239)
Info@kaurlawyer.com
The Law Office of Simran Kaur
122 East 12th Street,
Tracy, CA. 95376
Telephone: (925)817-0209

*Attorney for Petitioner*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION**

SURENDER KAMBOJ,

Petitioner,

v.

WARDEN, Facility Administrator of DESERT VIEW ANNEX;

THOMAS GILES of the Los Angeles Immigration and Customs Enforcement Field Office;

DAVID VENTURELLA, Acting Director of United States Immigration and Customs Enforcement;

MARKWAYNE MULLIN, Secretary of the United States Department of Homeland Security,

TODD BLANCHE, Acting Attorney General of the United States, acting in their official capacities,

Respondents.

CASE NO. ________________________

**PETITION FOR WRIT OF HABEAS CORPUS**

## INTRODUCTION

1. Petitioner, Surender Kamboj, is a 32-year-old citizen of India who follows the Hindu faith. He was born on June 9, 1994, in Karnal, Haryana, India. He entered the United States on or about June 30, 2019, near San Diego, California, seeking safety, stability, and lawful protection under United States immigration laws. He was taken into immigration custody upon entry, and an asylum officer found that he had a credible fear of persecution. On September 6, 2019, the Department of Homeland Security issued a Notice to Appear charging him with removability under sections 212(a)(7)(A)(i)(I) and 212(a)(6)(A)(i) of the Immigration and Nationality Act. On November 27, 2019, he was released from immigration custody on a bond of $15,500, with no other conditions. His Form I-589 asylum application was filed on or about April 8, 2020, and his removal proceedings remain pending before the Adelanto Immigration Court, with a master calendar hearing scheduled for November 10, 2026. Petitioner holds a valid Employment Authorization Document and a California driver license. Petitioner has no criminal history.

2. After his release, Petitioner settled in California, first in Sacramento and then in Stockton, where he lived at 2202 Grand Canal Blvd, Apt 09, Stockton, California 95207, before his detention. ICE imposed no reporting or supervision requirement on him, never directed him to report, and never contacted him in the nearly seven years between his release and his arrest. He lived openly under his own name, obtained employment authorization, obtained a California driver license, supported himself through lawful work, and regularly attends temple.

3. On October 1, 2026, Petitioner was visiting a friend in Fontana, California. After returning from buying groceries, he went to find a parking space for his car. An ICE officer sitting in a vehicle approached him and said that he was looking for a person named Singh. Petitioner explained that he is not Singh and that his name is Surender Kamboj, and he handed over his driver license when the officer asked to confirm his identity. While the officer was checking his license, two more ICE vehicles arrived, and the officers checked his documents. The officers then told

Petitioner that they could not find anything online about his case and that they were detaining him. That was the only reason given. Petitioner was not given advance notice or any opportunity to explain or contest the basis for his arrest.

4. The officers took Petitioner to the ICE office in San Bernardino, California, where they took his property, asked whether he had any medical issues, took his biometrics, collected a DNA swab, and, after thirty to forty minutes, allowed him a single telephone call. ICE then transported him to Adelanto, California. On the way, an ICE officer told Petitioner that if he accepted voluntary departure he would be paid $3,000. Petitioner refused and told the officer that he would rather fight his case. He was booked into the Desert View Annex in Adelanto, California, where he remains detained.

5. Petitioner has no criminal history, has a pending asylum application and a scheduled hearing, and was never placed under any ICE reporting or supervision requirement. ICE has not identified any violation, any change in circumstances, or any finding that he is a danger or a flight risk. His detention rests solely on an officer's statement that ICE "could not find anything online" about his case. Petitioner's detention serves no legitimate government purpose and is an arbitrary and unjustified deprivation of liberty.

6. Petitioner's summary arrest and detention violate substantive and procedural due process because they lack any individualized finding of danger or flight risk and were imposed without notice or an opportunity to be heard. His arrest reflects the broader pattern of ICE's quota-driven enforcement practices, which prioritize arrest numbers over individualized determinations. Petitioner respectfully seeks immediate relief from this Court to halt the ongoing harm and unlawful deprivation of his liberty.

7. This arrest is part of a new, nationwide initiative by ICE to arbitrarily arrest individuals. Since mid-May 2025, DHS has implemented a coordinated practice of leveraging immigration detention to strip people like Petitioner of their substantive and procedural rights and

pressure them into deportation. Immigration detention is civil, and thus is permissible for only two reasons: to ensure a noncitizen's appearance at immigration hearings and to prevent danger to the community. But ICE did not arrest and detain Petitioner, who demonstrably poses no risk of absconding from immigration proceedings or danger to the community, for either of these reasons. Instead, as part of its broader enforcement campaign, DHS detained Petitioner to strip him of his procedural rights, force him to forfeit his applications for relief, and pressure him into fast-track removal.

8. In immigration court, noncitizens have the right to pursue claims for relief from removal (including asylum), be represented by counsel, gather and present evidence, and pursue appeals. 8 U.S.C. § 1229(a). By dismissing an ongoing case, DHS, in its view, can transfer a noncitizen's case from2 removal proceedings in immigration court, governed by 8 U.S.C. § 1229a, to cursory proceedings under 8 U.S.C. § 1225(b)(1) called "expedited removal," where the procedural protections and opportunities to pursue relief from removal built into regular immigration-court proceedings do not apply.

9. Petitioner's arrest and detention have caused him tremendous and ongoing harm. Every additional day Petitioner spends in unlawful detention subjects him to further irreparable harm.

10. Since being detained, Petitioner has been separated from his home, his temple, and the lawful work he is authorized to perform, and his ability to prepare for his November 10, 2026 hearing has been impaired. The Constitution protects Petitioner and every other person present in this country from arbitrary deprivations of his liberty and guarantees him due process of law. The government's power over immigration is broad, but as the Supreme Court has declared, it "is subject to important constitutional limitations." *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001). "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992).

11. Petitioner respectfully seeks a writ of habeas corpus ordering the government to immediately release him from his ongoing, unlawful detention, and prohibiting his re-arrest without a hearing to contest that re-arrest before a neutral decisionmaker. In addition, to preserve this Court's jurisdiction, Petitioner also requests that this Court order the government not to transfer him outside of the district or deport him for the duration of this proceeding.

## JURISDICTION AND VENUE

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. §§ 2201–02 (Declaratory Judgment Act), 28 U.S.C. § 2241 (habeas corpus), Article I, § 9, cl. 2 of the U.S. Constitution (the Suspension Clause), the Fourth and Fifth Amendments to the U.S. Constitution, and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).

Venue is proper in this district and division pursuant to 28 U.S.C. § 2241(a) and 28 U.S.C. § 1391(b)(2) and (e)(1) because Petitioner is physically detained within this district.

## PARTIES

1) Petitioner, Surender Kamboj, is a 32-year-old citizen of India who follows the Hindu faith. He was born on June 9, 1994, in Karnal, Haryana, India. He entered the United States on or about June 30, 2019, seeking safety and freedom while fleeing persecution in India on account of his political opinion. His Form I-589 asylum application was filed on or about April 8, 2020 and remains pending, and his removal proceedings are pending before the Adelanto Immigration Court, with a master calendar hearing scheduled for November 10, 2026. Petitioner has no criminal history. Before detention, he lived in Stockton, California, and he is presently in civil immigration detention at the Desert View Annex in Adelanto, California.

2) Respondent Warden is the Facility Administrator of the Desert View Annex, 10450 Rancho Road, Adelanto, California, a facility that contracts with ICE to detain individuals suspected of civil immigration violations. This Respondent is Petitioner's immediate physical custodian and is sued in his or her official capacity.

3) Respondent Thomas Giles is the Field Office Director of the Los Angeles ICE Field Office. In this capacity, this Respondent is responsible for the administration and enforcement of immigration laws within ICE's Los Angeles Area of Responsibility, which includes San Bernardino County, where Petitioner was arrested and is detained, including decisions relating to Petitioner's arrest, detention, and custody. This Respondent maintains an office and regularly conducts business in this District and is sued in his official capacity.

4) Respondent David Venturella is the Acting Director of ICE. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States; routinely transacts business in this District; and is legally responsible for pursuing any effort to detain and remove the Petitioner. Respondent Venturella is sued in his official capacity.

5) Respondent Markwayne Mullin is the Secretary of Homeland Security and has ultimate authority over DHS. In that capacity and through his agents, Respondent Mullin has broad authority over and responsibility for the operation and enforcement of the immigration laws; routinely transacts business in this District; and is legally responsible for pursuing any effort to detain and remove the Petitioner. Respondent Mullin is sued in his official capacity.

6) Respondent Todd Blanche is the Acting Attorney General of the United States and the most senior official at the Department of Justice. In that capacity and through his agents, he is responsible for overseeing the implementation and enforcement of the federal immigration laws. The Attorney General delegates this responsibility to the Executive Office for Immigration Review, which administers the immigration courts and the BIA. Respondent Blanche is sued in his official capacity.

## EXHAUSTION

7) There is no requirement to exhaust because no other forum exists in which Petitioner can raise the claims herein. There is no statutory exhaustion requirement prior to challenging the constitutionality of an arrest or detention or challenging a policy under the Administrative Procedure Act. Prudential exhaustion is not required here because it would be futile, and Petitioner will "suffer irreparable harm if unable to secure immediate judicial

consideration of [their] claim." *McCarthy v. Madigan*, 503 U.S. 140, 147 (1992). Any further exhaustion requirements would be unreasonable.

## LEGAL BACKGROUND

### *A. The Constitution Protects Noncitizens Like Petitioner from Arbitrary Arrest and Detention.*

8) The Constitution establishes due process rights for "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017) (quoting *Zadvydas*, 533 U.S. at 693). These due process rights are both substantive and procedural.

9) *First*, "[t]he touchstone of due process is protection of the individual against arbitrary action of government," *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974), including "the exercise of power without any reasonable justification in the service of a legitimate government objective," *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).

10) These protections extend to noncitizens facing detention, as "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Accordingly, "[f]reedom from imprisonment - from government custody, detention, or other forms of physical restraint - lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690.

11) Substantive due process thus requires that all forms of civil detention - including immigration detention - bear a "reasonable relation" to a non-punitive purpose. *See Jackson v. Indiana*, 406 U.S. 715, 738 (1972). The Supreme Court has recognized only two permissible non-punitive purposes for immigration detention: ensuring a noncitizen's appearance at immigration proceedings and preventing danger to the community. *Zadvydas*, 533 U.S. at 690–92; *see also Demore v. Kim*, 538 U.S. 510 at 519–20, 527–28, 31 (2003).

12) *Second*, the procedural component of the Due Process Clause prohibits the government from imposing even permissible physical restraints without adequate procedural safeguards.

13) Generally, "the Constitution requires some kind of a hearing *before* the State

deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). This is so even in cases where that freedom is lawfully revocable. *See Hurd v. D.C., Gov't*, 864 F.3d at 683 (citing *Young v. Harper*, 520 U.S. 143, 152 (1997) (re-detention after pre-parole conditional supervision requires pre-deprivation hearing)); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (same, in probation context); *Morrissey v. Brewer*, 408 U.S. 471 (1972) (same, in parole context).

14) After an initial release from custody on conditions, even a person paroled following a conviction for a criminal offense for which they may lawfully have remained incarcerated has a protected liberty interest in that conditional release. *Morrissey* at 408 U.S. at 482. As the Supreme Court recognized, "[t]he parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions." *Id.* "By whatever name, the liberty is valuable and must be seen within the protection of the [Constitution]." *Id.*

15) This reasoning applies with equal if not greater force to people released from civil immigration detention at the border, like Petitioner. After all, noncitizens living in the United States like Petitioner have a protected liberty interest in their ongoing freedom from confinement. *See Zadvydas*, 533 U.S. at 690. And, "[g]iven the civil context [of immigration detention], [the] liberty interest [of noncitizens released from custody] is arguably greater than the interest of parolees." *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019).

## FACTUAL ALLEGATIONS

### *A. DHS Dramatically Expands the Scope of Expedited Removal.*

16) For decades, DHS applied expedited removal exclusively in the border enforcement context, with only narrow exceptions to that general rule. From 1997 until 2002, expedited removal applied only to inadmissible noncitizens arriving at ports of entry. *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures; Final Rule, 62 Fed. Reg. 10312 (Mar. 6, 1997).

17) In 2002, the government for the first time invoked its authority to apply expedited removal to persons already inside the country, but only for a narrow group of people who arrived by sea, were not admitted or paroled, and were apprehended within two years of entry. *See* Notice

Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68924 (Nov. 13, 2002).

18) In 2004, the government authorized the application of expedited removal to individuals who entered by means other than sea, but only if they were apprehended within 100 miles of a land border and were unable to demonstrate that they had been continuously physically present in the United States for 14 days. *See* Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877 (Aug. 11, 2004).

19) In 2019, at the direction of President Trump, DHS published a Federal Register Notice authorizing the application of expedited removal to certain noncitizens arrested anywhere in the country who could not affirmatively show that they had been continuously present for two years. *See* Designating Aliens for Expedited Removal, 84 Fed. Reg. 35409 (July 23, 2019). The District Court for the District of Columbia entered a preliminary injunction preventing the rule from taking effect, which the D.C. Circuit later vacated. *Make the Rd. New York v. McAleenan*, 405 F. Supp. 3d 1, 11 (D.D.C. 2019), *vacated sub nom. Make the Rd. New York v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020).

20) In 2021, President Biden directed the DHS Secretary to review the rule expanding expedited removal and consider whether it comported with legal and constitutional requirements, including due process. In 2022, DHS rescinded the rule. *See* Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal, 87 Fed. Reg. 16022 (Mar. 21, 2022).

21) While the 2019 expansion was in effect, the government applied expedited removal to persons inside the country in an exceedingly small number of cases. Thus, from 1997 to 2025, with limited exceptions, immigration authorities generally did not apply expedited removal to noncitizens apprehended far from the border, or individuals anywhere in the United States (including near the border) who had been residing in the country for more than fourteen days.

22) This state of affairs changed drastically on January 20, 2025, the day that President Trump took office for his second term. That day, President Trump signed Executive Order 14159, "Protecting the American People Against Invasion," the purpose of which was "to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those

aliens who threaten the safety or security of the American people." Exec. Order No. 14,159, 90 C.F.R. § 8443 (Jan. 20, 2025). The order directed the Secretary of Homeland Security to take various actions "to ensure the efficient and expedited removal of aliens from the United States." *Id*.

23) To implement this Executive Order, DHS issued a notice immediately authorizing application of expedited removal to certain noncitizens arrested anywhere in the country who cannot show "to the satisfaction of an immigration officer" that they have been continuously present in the United States for at least two years. 90 Fed. Reg. 8139 (published Jan. 24, 2025).

24) On January 23, 2025, the Acting Secretary of Homeland Security issued a memorandum providing guidance regarding how to exercise enforcement discretion in implementing" the new expedited-removal rule. The guidance directed federal immigration officers to "consider . . . whether to apply expedited removal" to "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied." As part of that process, the guidance encourages officers to "take steps to terminate any ongoing removal proceeding and/or any active parole status."[1]

25) Under the administration's expanded approach to expedited removal, hundreds of thousands of noncitizens who have lived in the country for less than two years are at imminent risk of summary removal without any hearing, meaningful process, access to counsel, or judicial review - regardless of the strength of their ties to the United States.

### *B. To Place More People in Expedited Removal, DHS Undertakes New Campaign of Arrests and Detention.*

26) Since mid-May 2025, DHS has initiated an aggressive new enforcement campaign targeting people who are in regular removal proceedings in immigration court, many of whom have pending applications for asylum or other relief. This "coordinated operation" is "aimed at dramatically accelerating deportations" by arresting people at the courthouse or other places and

[1] Benjamin C. Huffman, *Guidance Regarding How to Exercise Enforcement Discretion*, Dep't of Homeland Sec. (Jan. 23, 2025), https://www.dhs.gov/sites/default/files/2025-01/25_0123_er-and-parole-guidance.pdf.

placing them into expedited removal.[2]

27) The first step of this enforcement operation typically takes place inside the immigration court or with ICE agents due to baseless ISAP violations. When people arrive in court for their master calendar hearings, DHS attorneys orally file a motion to dismiss the proceedings - without any notice to the affected individual. Although DHS regulations do not permit such motions to dismiss absent a showing that the "[c]ircumstances of the case have changed," 8 C.F.R. § 239.2(a)(7), (c), DHS attorneys do not conduct any case-specific analysis of changed circumstances before filing these motions to dismiss. Or, as with Petitioner, where ICE officers encounter and arrest individuals with pending immigration cases in public, without notice or process.

28) Even though individuals are supposed to have ten days to respond to a motion to dismiss, some IJs have granted the government's oral motion on the spot and immediately dismissed the case. This is consistent with recent instructions from the Department of Justice to immigration judges stating that they may allow the government to move to dismiss cases orally, in court, without a written motion, and to decide that motion without allowing the noncitizen an opportunity to file a response.

29) Despite these instructions, some IJs have still asked DHS to re-file the motion as a written motion and continued proceedings to allow individuals to file their response. A smaller group of IJs have expressly denied the motion to dismiss on the record or in a written order.

30) The next step of DHS's new campaign takes place outside the courtroom. ICE officers, in consultation with DHS attorneys and officials, station themselves in courthouse waiting rooms, hallways, and elevator banks. When an individual exits their immigration hearings, ICE officers - typically masked and in plainclothes - immediately arrest the person and detain them. ICE officers execute these arrests regardless of how the IJ rules on the government's motion to

---

[2] Arelis R. Hernández & Maria Sacchetti, *Immigrant Arrests at Courthouses Signal New Tactic in Trump's Deportation Push*, Wash. Post, May 23, 2025, https://www.washingtonpost.com/immigration/2025/05/23/immigration-court-arrests-ice-trump/; *see also* Hamed Aleaziz, Luis Ferré-Sadurní, & Miriam Jordan, *How ICE is Seeking to Ramp Up Deportations Through Courthouse Arrests*, N.Y. Times, May 30, 2025, https://www.nytimes.com/2025/05/30/us/politics/ice-courthouse-arrests.html.

dismiss. On information and belief, they typically do not have an arrest warrant.

31) Once the person has been transferred to a detention facility, the government places the individual in expedited removal. In cases in which the IJ did not dismiss the person's removal proceedings, DHS attorneys unilaterally transfer venue of the case to a "detained" immigration court, where they renew their motions to dismiss - again with the goal of putting the person in expedited removal.

32) DHS is aggressively pursuing this arrest and detention campaign at courthouses throughout the country and with the help of ICE agents at check ins. In New York City, for example, "ICE agents have apprehended so many people showing up for routine appointments this month that the facilities" are "overcrowded," with "[h]undreds of migrants . . . sle[eping] on the floor or sitting upright, sometimes for days."[3]

33) DHS's and ICE's aggressive tactics appear to be motivated by the Administration's imposition of a new daily quota of 3,000 ICE arrests.[4] In part as a result of this campaign, ICE's arrests of noncitizens with no criminal record have increased more than 800% since before January.[5]

34) The government's new campaign is also a significant shift from previous DHS practice of re-detaining noncitizens only after a material change in circumstances. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1197 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018) (describing prior practice).

***C. Petitioner is Unlawfully Arrested and Detained.***

35) Petitioner, Surender Kamboj, follows the Hindu faith. He fled India after he was

---

[3] Luis Ferré-Sadurní, *Inside a Courthouse, Chaos and Tears as Trump Accelerates Deportations*, N.Y. Times, June 12, 2025, https://www.nytimes.com/2025/06/12/nyregion/immigration-courthouse-arrests-trump-deportation.html.

[4] Ted Hesson & Kristina Cooke, *ICE's Tactics Draw Criticism as it Triples Daily Arrest Targets,* Reuters, June 10, 2025, https://www.reuters.com/world/us/ices-tactics-draw-criticism-it-triples-daily-arrest-targets-2025-06-10/; Alayna Alvarez & Brittany Gibson, *ICE Ramps Up Immigration Arrests in Courthouses Across the U.S.*, Axios, June 12, 2025, https://www.axios.com/2025/06/12/ice-courthouse-arrests-trump.

[5] José Olivares & Will Craft, *ICE Arrests of Migrants with No Criminal History Surging under Trump*, The Guardian, June 14, 2025, https://www.theguardian.com/us-news/2025/jun/14/ice-arrests-migrants-trump-figures.

attacked and threatened by members of the Bharatiya Janata Party because of his and his family's long-standing support for the Indian National Lok Dal party, and he entered the United States seeking safety and protection. He was born on June 9, 1994, in Karnal, Haryana, India, and is a citizen of India. Before his detention, he lived a peaceful and stable life in Stockton, California. His Form I-589 asylum application was filed on or about April 8, 2020 and remains pending, and his master calendar hearing is scheduled for November 10, 2026 before the Adelanto Immigration Court.

36) Petitioner entered the United States on or about June 30, 2019, near San Diego, California. He was taken into immigration custody, and an asylum officer found that he had a credible fear of persecution. On September 6, 2019, the Department of Homeland Security issued a Notice to Appear charging him with removability under sections 212(a)(7)(A)(i)(I) and 212(a)(6)(A)(i) of the Immigration and Nationality Act; the Notice to Appear was served on him on September 30, 2019, at the Folkston ICE Processing Center in Folkston, Georgia. On November 27, 2019, he was released from immigration custody on a bond of $15,500. No other conditions were placed on his release, and he has resided continuously in the United States since his entry.

37) In the nearly seven years that followed, ICE never required Petitioner to report, never placed him on any form of monitoring, and never contacted him. Petitioner lived openly under his own name, first in Sacramento and then in Stockton, California. He filed his asylum application, obtained employment authorization (currently valid from November 25, 2023 through November 24, 2028), obtained a California driver license issued on June 26, 2026, and supported himself through lawful work. He complied with everything that was ever asked of him.

38) On October 1, 2026, Petitioner was visiting a friend in Fontana, California. In the morning he went out to buy groceries. When he returned, he parked in front of his friend's apartment to carry the groceries inside and then went back out to find a parking space. While he was looking for parking, an ICE officer sitting in a vehicle approached him and said that he was looking for a person named Singh. Petitioner told the officer that he is not Singh and that his name is Surender Kamboj. The officer asked for his driver license to confirm his identity, and Petitioner gave it to him. While the officer was checking the license, two more ICE vehicles arrived, and the

officers checked Petitioner's documents.

39) The officers then told Petitioner that they could not find anything online about his case and that they were detaining him. That was the only reason the officers gave. ICE did not identify any violation of any condition, any change in circumstances, or any basis to believe that Petitioner is a danger or a flight risk, and it has not identified one since. Petitioner was not provided advance notice or an opportunity to contest the basis for his arrest.

40) The officers took Petitioner to the ICE office in San Bernardino, California. There, they took his property, asked whether he had any medical issues, took his biometrics, and collected a DNA swab. After approximately thirty to forty minutes, they allowed him to make one telephone call to say that he had been detained. ICE then transported him to Adelanto, California. On the way, an ICE officer told Petitioner that if he accepted voluntary departure, he would be given $3,000. Petitioner said no and told the officer that he would rather fight his case. He was booked into the Desert View Annex in Adelanto, California, in San Bernardino County, where he remains detained.

41) Petitioner has never violated any ICE directive or supervision requirement; ICE never imposed one. His detention serves no legitimate government purpose and represents an unlawful deprivation of liberty inconsistent with the Fifth Amendment. Petitioner's arrest was not based on any evidence of dangerousness or risk of flight; it was based on nothing more than an officer's inability to find his case online.

***D. As a Result of His Arrest and Detention, Petitioner is Suffering Ongoing and Irreparable Harm.***

42) Petitioner is being deprived of his liberty without any permissible justification. The government previously released him on bond because he did not pose sufficient risk of flight or danger to the community to warrant detention. For nearly seven years, the government allowed Petitioner to remain at liberty without any reporting or supervision requirement, during which time he filed his asylum application, obtained employment authorization and a California driver license, and lived openly.

43) None of that has changed. Petitioner has no criminal record, and there is no basis to believe that he poses any public-safety risk. Nor is Petitioner conceivably a flight risk. His

asylum application remains pending, his master calendar hearing is scheduled for November 10, 2026, and his entire future depends on appearing and pursuing his case. When ICE offered him $3,000 to accept voluntary departure, he refused and said he would rather fight his case. He has every incentive to appear at every hearing.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violation of the Fifth Amendment to the United States Constitution

### (Substantive Due Process - Detention)

44) Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

45) The Due Process Clause of the Fifth Amendment protects all "person[s]" from deprivation of liberty "without due process of law." U.S. Const. amend. V. "Freedom from imprisonment - from government custody, detention, or other forms of physical restraint - lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690.

46) Immigration detention is constitutionally permissible only when it furthers the government's legitimate goals of ensuring the noncitizen's appearance during removal proceedings and preventing danger to the community. *See id.*

47) Petitioner is not a flight risk or danger to the community. Respondents' detention of Petitioner is therefore unjustified and unlawful. Accordingly, Petitioner is being detained in violation of the Due Process Clause of the Fifth Amendment.

48) Moreover, Petitioner's detention is punitive as it bears no "reasonable relation" to any legitimate government purpose. *Id.* (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). Here, the purpose of Petitioner's detention appears to be "not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons", namely, to meet newly-imposed DHS quotas and to pressure Petitioner into abandoning his pending claims for relief, as shown by the offer of $3,000 to accept voluntary

departure made while he was being transported to the detention facility. *Demore*, 538 U.S. at 532–33 (Kennedy, J., concurring).

**SECOND CLAIM FOR RELIEF**

**Violation of the Fifth Amendment to the United States Constitution**

**(Procedural Due Process - Detention)**

49) Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Petition as if fully set forth herein.

50) As part of the liberty protected by the Due Process Clause, Petitioner has a weighty liberty interest in avoiding re-incarceration after his release. *See Young v. Harper*, 520 U.S. 143, 146–47 (1997); *Gagnon v. Scarpelli*, 411 U.S. 778, 781–82 (1973); *Morrissey v. Brewer*, 408 U.S. 471, 482–83 (1972); *see also Ortega*, 415 F. Supp. 3d at 969–70 (holding that a noncitizen has a protected liberty interest in remaining out of custody following an IJ's bond determination).

51) Accordingly, "[i]n the context of immigration detention, it is well-settled that due process requires adequate procedural protections to ensure that the government's asserted justification for physical confinement outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Hernandez*, 872 F.3d at 990 (cleaned up); *Zinermon*, 494 U.S. at 127 (Generally, "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property."). In the immigration context, for such hearings to comply with due process, the government must bear the burden to demonstrate, by clear and convincing evidence, that the noncitizen poses a flight risk or danger to the community. *See Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011); *see also Martinez v. Clark*, 124 F.4th 775, 785, 786 (9th Cir. 2024).

52) Petitioner's re-detention without a pre-deprivation hearing violated due process.

Nearly seven years after Petitioner was released from custody on bond, Respondents re-detained him with no advance notice, no explanation of the justification for re-detention beyond an officer's statement that ICE could not find anything online about his case, and no opportunity to contest his re-detention before a neutral adjudicator. He was arrested on October 1, 2026, in a parking area in Fontana, California, by officers who said they were looking for someone else.

53) These facts are materially indistinguishable from *Y.S.G. v. Andrews*, No. 2:25-cv-01884-SCR (E.D. Cal. Oct. 22, 2025), where the Court granted a writ of habeas corpus after finding that ICE violated due process by re-detaining a previously released individual without advance notice or a pre-deprivation hearing. In *Y.S.G.*, DHS at least claimed a technical violation of supervision conditions but offered no proof that the individual posed a danger or flight risk; here, Respondents have not claimed any violation at all. The court held that any re-detention requires a pre-deprivation hearing before a neutral adjudicator, at which the government bears the burden to establish danger or flight risk by clear and convincing evidence. Petitioner, who was never subject to any supervision requirement, has a pending case and a scheduled hearing, and poses no danger, was similarly re-detained in violation of his constitutional rights.

## PRAYER FOR RELIEF

Petitioner respectfully requests that this Court:

1. Assume jurisdiction over this matter;
2. Issue a writ of habeas corpus ordering Respondents to immediately release Petitioner from custody;
3. Declare that Petitioner's arrest and detention violate the Due Process Clause of the Fifth Amendment.
4. Enjoin Respondents from transferring Petitioner outside this District or deporting Petitioner pending these proceedings;

5. Enjoin Respondents from re-detaining Petitioner unless his re-detention is ordered at a custody hearing before a neutral arbiter in which the government bears the burden of proving, by clear and convincing evidence, that Petitioner is a flight risk or danger to the community;

6. Award Petitioner his costs and reasonable attorneys' fees in this action as provided for by the Equal Access to Justice Act and 28 U.S.C. § 2412; and

7. Grant such further relief as the Court deems just and proper.

Date: October 16, 2026

Respectfully Submitted,

/s/ Simranjit Kaur

Simranjit Kaur (SBN 309239)
Info@kaurlawyer.com
The Law Office of Simran Kaur
122 East 12th Street,
Tracy, CA. 95376
Telephone: (925)817-0209

*Attorneys for Petitioner*

**VERIFICATION PURSUANT TO 28 U.S.C. 2242**

I am submitting this verification on behalf of the Petitioner because I am one of Petitioner's attorneys. I have discussed with Petitioner, Surender Kamboj, the events described in the Petition. Based on those discussions, I hereby verify that the factual statements made in the attached Petition for Writ of Habeas Corpus are true and correct to the best of my knowledge. Executed on this October 16, 2026.

Simranjit Kaur

*/s/ Simranjit Kaur*
Simranjit Kaur
Attorney for Petitioner